**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

NEDAL NABHAN,

           Plaintiff,

           v.                          CAUSE NO.: 2:21-CV-253-TLS

INDIANA STATE POLICE and THOMAS
A. BURGETT,

           Defendant.

**OPINION AND ORDER**

Plaintiff Nedal Nabhan, a Palestinian Arab American, filed an Amended Complaint [ECF No. 4] against Defendants Indiana State Police (ISP) and Thomas A. Burgett. Against ISP, the Plaintiff brings Title VII claims of hostile work environment based on race and national origin (Count I) and retaliation (Count II). Pursuant to 42 U.S.C. § 1983, the Plaintiff brings a Fourteenth Amendment equal protection claim against Sergeant Burgett based on the Plaintiff's race and national origin (Count III). This matter is now before the Court on the Defendants' Motion for Summary Judgment [ECF No. 62]. The Plaintiff filed a Response [ECF No. 74], and the Defendants filed a Reply [ECF No. 87]. With leave of Court, the Plaintiff filed a Surreply [ECF No. 90], and the Defendants filed a Sur-Surreply [ECF No. 92]. As set forth below, the Court grants the Defendants' motion on all claims.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant may discharge this burden by "either: (1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or

(2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citation omitted). In response, the non-movant "must make a sufficient showing on every element of his case on which he bears the burden of proof; if he fails to do so, there is no issue for trial." *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). In ruling on a motion for summary judgment, a court must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Id.* (citation omitted). A court's role "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted).

## EVIDENTIARY RULINGS

Pursuant to Northern District of Indiana Local Rule 56-1(f), the Defendants made several evidentiary objections, which are fully briefed.

**A.    Plaintiff's Exhibits 1 and 2**

*1.    Expert Testimony*

The Defendants ask the Court to strike paragraphs 106–109 of the Plaintiff's affidavit and paragraphs 43 and 45–48 of his wife's affidavit as expert testimony on medical conditions, diagnosis, or causation they are unqualified to give under Rule 702. *See* Exs. 1, 2.[1] The Plaintiff responds that he and his wife have personal knowledge of these facts. The Court orders that the Plaintiff and his wife may testify about their own perceptions of the Plaintiff's mental health but

---

[1] Plaintiff's Exhibits 1–36 are at ECF No. 75, and Plaintiff's Exhibits 37 and 38 are at ECF No. 91.

may not testify about the diagnosis or the cause of the diagnosis. *See Collins v. Kibort*, 143 F.3d 331, 337 (7th Cir. 1998) ("A witness does not need to be a doctor to discuss his or her health in general terms."); Fed. R. Evid. 701; *see Chapman v. Evans*, No. 15 CV 5907, 2022 WL 1642235, at *3 (N.D. Ill. Jan. 6, 2022) ("[W]hile Plaintiffs' witnesses may 'offer testimony about treatment and symptoms,' they may not 'offer medical opinion testimony. Specifically, [witnesses] cannot testify as to causation, only as to what happened and how it made [either Plaintiff] feel.'" (citing cases)). Therefore, the Court strikes ¶ 107 of the Plaintiff's affidavit and ¶ 45 of Mrs. Nabhan's affidavit and otherwise denies the motion.

2.    *Inconsistencies Between Affidavits and Deposition Testimony*

The Defendants also argue that certain statements in the affidavits should be disregarded under the sham affidavit rule. The Plaintiff did not respond to this argument. Accordingly, the Court sustains the objection and strikes paragraphs 46–50 and 66 of the Plaintiff's affidavit and paragraphs 11–19 of Mrs. Nabhan's affidavit.

**B.    Plaintiff's Exhibits 7, 19, 20, 21, 22, 23, 24, 25, and 31**

The Defendants move to strike several exhibits as unauthenticated. The Court denies the motion as moot as to Exhibits 7, 19–20, 22–25, and 31 because the exhibits are not material to the Court's decision. The Court overrules the objection to Exhibit 21—a printout of the Wiktionary page for the definition of "durka, durka"—because the Plaintiff's affidavit certifies that he provided his attorney with the printout and the printout has indicia of reliability such as the print date and the URL. *See* Ex. 37 ¶ 4; Fed. R. Evid. 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."); *Keenan v. Home Depot U.S.A., Inc.*, No. 16-CV-4530, 2021 WL 4264358, at *8 (N.D. Ill. Sept. 20, 2021) ("For a

commercial website, an affidavit of a witness, when viewed in combination with circumstantial indicia of authenticity (such as the existence of the URL, date of printing, or other identifying information), generally suffices to satisfy the authentication requirement." (cleaned up)).

### C.    Plaintiff's Exhibit 27

Exhibit 27 is a letter from Dr. Gerald A. Sheiner who conducted a psychiatric examination of the Plaintiff. The Defendants move to strike the exhibit under Federal Rule of Civil Procedure 37(c)(1), arguing that the letter fails to meet the requirements of an expert report under Federal Rule of Civil Procedure 26(a)(2)(B) and because the Plaintiff did not disclose an expert by the May 15, 2023 deadline. However, on December 30, 2022, the Plaintiff timely provided Dr. Sheiner's expert written report by email to then-counsel for Defendants Julie Tront and current defense counsel Erica Sawyer. Ex. 38. Thus, the expert disclosure was timely, as recognized by the Defendants in reply. The Defendants also raise a hearsay objection, which the Court overrules because Dr. Sheiner would be a competent witness to testify at trial as to his examination, diagnoses, and opinions set forth in his signed letter. *See Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014) ("[T]he Federal Rules of Civil Procedure allow parties to oppose summary judgment with materials that would be inadmissible at trial so long as *facts* therein could later be presented in an admissible form." (citing Fed. R. Civ. P. 56(c)(2)); *Litton v. Navien, Inc.*, No. 4:20-CV-251, 2023 WL 2712369, at *6 (S.D. Ind. Mar. 30, 2023). The Court denies the motion as to this exhibit.

### D.    Plaintiff's Exhibit 11

Exhibit 11 appears to be screen captures, which the Defendants argue should be excluded as unauthenticated and hearsay. While the Plaintiff has now submitted an affidavit stating that he provided the document to his attorney, Ex. 37, ¶ 4, the affidavit does not state that the Plaintiff

created the document or that it was a true and accurate copy of the screen shots of the site from which he took the images. Moreover, there are no indicia of authenticity. *See* Fed. R. Evid. 901. The Court grants the motion to strike Exhibit 11.

### E.    Plaintiff's Exhibit 14

Exhibit 14 is an August 15, 2017 report regarding Sgt. Burgett's response to a roadway incident when he was a trooper. The report contains statements that he was rude and hostile and allegedly used profanity when addressing three individuals at the scene of a disabled truck. The Defendants argue the document contains inadmissible hearsay, is irrelevant, and should be excluded under Federal Rule of Evidence 404(b). The Court sustains the relevancy objection because the profanity was unrelated to race or national origin, was not directed at a trooper Burgett was supervising, and did not occur during the relevant period.[2]

### F.    Plaintiff's Exhibit 26

Exhibit 26 is an October 16, 2020 letter from an attorney to the Governor of Indiana. The Court sustains the Defendants' hearsay objection because the letter is being offered for the truth of the statements in the letter and the Plaintiff offers no response to the hearsay objection.

### G.    Excess Pages

The Defendants move to strike the pages of the Plaintiff's response brief that exceed the 25-page limit. In response, the Plaintiff apologizes for the rule violation and asks that the excess pages not be stricken because of the complexity of the arguments presented by the Defendant. Construing this as a belated request for leave to file an oversize brief "for extra extraordinary and

---

[2] *See, e.g.*, *Smith v. Ill. Dep't of Transp.*, 936 F.3d 554, 561 (7th Cir. 2019) (recognizing that "[w]hile the [swear words, including the 'f-word',] may have made for a crude or unpleasant workplace, Title VII imposes no general civility code," (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 452 (2013) (cleaned up)), and finding that the plaintiff did not establish a hostile work environment because he had "introduced no evidence that his superiors swore at him because he was black").

compelling reasons," N.D. Ind. L.R. 7-1(e)(2), the Court grants the Plaintiff's request in the interests of justice, noting that the Court granted the Defendants' request to file an oversized brief in reply, *see* ECF No. 84. Counsel for the Plaintiff is cautioned that a future failure to comply with the local rules may result in the filing being stricken.

## MATERIAL FACTS[3]

### A.    The Indiana State Police Commercial Vehicle Enforcement Division

The Indiana State Police Commercial Vehicle Enforcement Division (CVED) is responsible for the regulation and enforcement of the Federal Motor Carrier Safety Regulations. Ex. B, 18:23–19:5. Indiana State Police (ISP) employs troopers who work the road as well as enforcement troopers who work in the compliance review investigation squad. Ex. C, 11:5–15. One sergeant supervises the investigation squad, eight field sergeants oversee the trooper squads throughout the state, one sergeant supervises the new entrant safety audit squad, and there are two administrative sergeants. *Id.* 15:1–9. The enforcement troopers are responsible for conducting in-depth investigations of commercial motor vehicle carriers and drivers, which can result in enforcement action. Ex. D, ¶ 7. The enforcement troopers' reports of safety inspection findings must be reviewed by the sergeant prior to submission. Ex. C, 13:7–10, 14:6–9.

### B.    The Parties

Plaintiff Nedal Nabhan, a Palestinian Arab American, started working with ISP in 2007 and lives in Portage, Indiana. Ex. A, 14:11–12, 17–18, 66:8–10. He has held several positions within ISP, including working the toll road district in Portage and on the drug interdiction team,

---

[3] The Court disregards substantive arguments and characterization of the evidence in the fact statements and considers the facts only as supported by the cited evidence of record and as material to this decision. Under the summary judgment standard, the facts are viewed in the light most favorable to the Plaintiff notwithstanding Sgt. Burgett's testimony disputing several events. The Defendants' exhibits are identified by letters, *see* ECF Nos. 63, 85-1, and the Plaintiff's exhibits are identified by numbers, *see* ECF Nos. 75, 91-1. The Defendants did not file Exhibit I. *See* ECF No. 63.

as a commercial vehicle enforcement officer with CVED working on the road, as an enforcement trooper on the compliance review investigation squad with CVED (beginning in May 2019 and at the time of the events in this case), and as a detective in the intelligence and investigative unit after a promotion in 2021. Ex. A, 10:11–14:18; Ex. P. While troopers primarily work from home, Ex. B, 30:15–20, the Plaintiff is based out of the Lowell district office, Ex. A, 10:18–25.

Defendant Sergeant Thomas A. Burgett, a white male, has also been with ISP since 2007, has been a sergeant with CVED since his promotion in November 2019, and is the Compliance Review Squad Leader supervising enforcement troopers within CVED. Ex. B, 16:3–7, 18:18–24, 22:24–23:5, 25:5–8, 26:5–9, 57:24–58:2; Ex. D, ¶ 2. Although the Plaintiff and Sgt. Burgett went through the ISP academy together, Sgt. Burgett knew of the Plaintiff but did not get to know him. Ex. B, 20:22–21:11. During the academy, Sgt. Burgett received equal employment opportunity training and was taught that racial harassment was against ISP policy and against the law. *Id.* 26:10–27:7. ISP requires a yearly training on anti-harassment for all employees. Ex. C, 22:17–23:7. Upon his promotion to the rank of sergeant in November 2019, Sgt. Burgett became the Plaintiff's supervisor and began a standard one-year probationary period, although the period was extended because of the investigation underlying this case as discussed in Part E below. Ex. B, 25:25–26:9, 58:1–6; Exs. G, H, J at 1.

From January 2019 to May 16, 2019, the Plaintiff worked as a CVED trooper on the road and reported to Sgt. Dale Turner. Ex. P. On May 17, 2019, the Plaintiff began as an enforcement trooper on the compliance review investigation squad, supervised by First Sergeant Eugene Hans Schmidt until November 16, 2019, and then by Sgt. Burgett beginning November 17, 2019, who continued to be his supervisor into December 2020. *Id.*; Ex. A, 18:2–7; Ex. C, 25:4–6; Ex. D, ¶ 9. Sgt. Burgett was a compliance review enforcement trooper prior to his promotion. Ex. J.

F/Sgt. Schmidt is now the assistant investigations commander within the CVED. Ex. B, 9:16–19.

At all relevant times, F/Sgt. Schmidt was Sgt. Burgett's supervisor. Ex. B, 9:1–15, 18:11–17,

19:25–20:2. Lieutenant Utterback was the Investigations Commander. Ex. B, 61:21–62:2. Major

Jon Smithers is the CVED Division Commander. Ex. C, 10:21–23.

### C.    Facts Underlying the Plaintiff's Hostile Work Environment Claim

*1.    Sgt. Burgett's Communication Style and Supervisory Style*

The Plaintiff stated that, once Sgt. Burgett became his supervisor, Sgt. Burgett called

multiple times a day, including after hours, that the calls were petty, that Sgt. Burgett would

berate and scold him over minor issues like misspelling and punctuation errors in his reports, and

that Sgt. Burgett's tone of voice was demeaning and unprofessional, talking to him like a

juvenile who did not know what he was doing. Ex. 1, ¶¶ 27–29, 32. Sgt. Burgett testified that he

had almost daily contact with the Plaintiff because the investigator position requires extensive

communication, which included work-related discussions about corrections, direction, and

investigations. Ex. B, 29:17–30:9. Sgt. Burgett initially called the Plaintiff every day because

F/Sgt. Schmidt told him to, but he was later instructed by command not to call the Plaintiff every

day. Ex. N at 9. The Plaintiff testified that "it was always going to be [negative], and if there was

a positive comment, it was extremely sarcastic." Ex. A, 24:15–25:2. The Plaintiff felt he was

being harassed by being talked to in this way almost daily and that the "negative and abusive"

workplace was a daily occurrence. *Id.* 24:4–8, 66:16–22; Ex. 1, ¶ 23. Things got worse after Sgt.

Burgett went to a leadership class because he would ask in a mocking way, "Have I told you that

I appreciate you today?" Ex. M, 2. Sgt. Burgett stated that he asks this question of all his

subordinates. Ex. N at 10.

As an example of feeling degraded, the Plaintiff described Sgt. Burgett going over his work with him and saying, "Hey, you know, what is this?" and the Plaintiff would explain it. Sgt. Burgett would then force the Plaintiff to read something else and ask, "Do you understand?" to which the Plaintiff would respond, "No, I don't." Sgt. Burgett would reply, "What don't you understand about that?" The Plaintiff believed Sgt. Burgett was trying to get him to understand Sgt. Burgett's perspective. Ex. A, 25:8–25:21.

During his December 2, 2020 interview for the investigation into his complaint of harassment by Sgt. Burgett, *see infra* Part E, the Plaintiff said that Sgt. Burgett is a terrible supervisor; his leadership skills are nonexistent; he is very intelligent and knows it and makes sure you know it; he knows the job well, but if you falter he makes a mockery of you; and it had been that way the entire time he was his supervisor. Ex. M, 1. The Plaintiff testified that Sgt. Burgett treated any mistake as a "huge deal" and would get irritated and frustrated to the point of raising his voice. Ex. A, 25:25–26:7. Sgt. Burgett routinely returned the Plaintiff's work product for correction of inconsequential errors, which caused the Plaintiff's work to be delayed and resulted in Sgt. Burgett harassing the Plaintiff about late work. Ex. 1, ¶¶ 61–68. The Plaintiff felt an incredible amount of pressure and felt that no matter how hard he worked, it was not going to be enough, which dampened his effort and drive. Ex. A, 70:14–22. He took longer to prepare his reports due to his fear that Sgt. Burgett would overly scrutinize his work. *Id.* 70:23–71:5.

Master Trooper Rimel, a white male, avers that Sgt. Burgett's "manner of talking with team Troopers was demeaning, humiliating, and demoralizing to the point that I and two other Troopers requested transfer out of his squad." Ex. 3, ¶ 10. He further avers that, once promoted, Sgt. Burgett changed the procedures for investigating and preparing compliance review reports, which consisted of wording reports his way, requesting unnecessary documents from third

parties, and correcting inconsequential typos on a report. *Id.* ¶¶ 8, 9. During his investigation interview, Rimel described Sgt. Burgett as "almost tyrannical" and that it "was constantly his way or the highway." Ex. 5 at 4. He stated that "[Sgt.] Burgett did not want to hear that [Rimel] was having issues with the program that he just had to get it done." *Id.*

Master Trooper Thomas DeVries stated during his investigation interview that the Plaintiff and Master Trooper Rimel received more negative attention from Sgt. Burgett than he did, that Sgt. Burgett was hard on them, and that Sgt. Burgett was a micromanager. Ex. 4 at 2. He stated Sgt. Burgett pushed the troopers to be harsher in their reviews and findings, he wanted people to do things his way, and he would return any reports that had errors. *Id.* The Plaintiff avers that, by the time he requested a transfer in October 2020, *see infra* Part D, Rimel and DeVries had transferred out because of Sgt. Burgett's belligerent leadership style. Ex. 1, ¶ 78.

During his investigation interview, F/Sgt. Schmidt stated that Sgt. Burgett is a micromanager and is not polished in dealing with people when there is work to accomplish. He was also surprised to find only one positive comment in Sgt. Burgett's supervisory notes on the Plaintiff. Ex. D-1; Ex. O at 3.

*2.     Comments About Gary, Indiana*

Sgt. Burgett knew that the Plaintiff lives in northwestern Indiana. Ex. A, 26:18–19. When the Plaintiff would make a mistake, Sgt. Burgett would say, "Oh well, I guess that's just how they do things in the Gary area." *Id.* 26:22–25. The Plaintiff understood that Sgt. Burgett thought less of people from Gary and took the comment to be derogatory towards him because of where he lived. *Id.* 27:1–13. The Plaintiff stated that, although Sgt. Burgett did not reference the ethnic diversity of the area, "he would beat around the bush about it." Ex. M at 4.

3.    *Rap Song Incident*

In December 2019, Sgt. Burgett said to the Plaintiff, who listens to rap music, "Hey, I got something for you," and then played a rap song over the phone. Ex. A, 27:21–28:1; Ex. M at 11. Sgt. Burgett said the rapper was from the Chicagoland or Gary area, but the Plaintiff did not recognize the song or artist. Ex. A, 28:14–19; Ex. M at 11. The Plaintiff testified that he "was trying to get work done" and "didn't know . . . what it had to do with my work." Ex. A, 28:4–11.

4.    *"It's the Russians" Comments*

During an on-site investigation by Sgt. Burgett and the Plaintiff of a company whose owner spoke with a heavy Eastern European accent, a ping sound was heard, and Sgt. Burgett said, "Is that a Russian Submarine?" Ex. 8 at 2; Ex. A, 32:18–33:11; Ex. N at 10; *see also* Answer ¶ 26, ECF No. 18; Ex. I-1 at 2. Sgt. Burgett acknowledges that the comment was unprofessional. Ex. N at 10. During the investigation of a different company, the company representative—a woman with a heavy Lithuanian accent—was having trouble with her computer and Sgt. Burgett said, "It's the Russians." Ex. 8 at 2; Ex. M at 8; *see also* Ex. I-1 at 2; Ex. N at 10. Sgt. Burgett regretted making the comment. Ex. N at 10. He was disciplined for this incident. *See infra* Part E.

5.    *"Checking for Bombs" Comment*

On March 19, 2020, Sgt. Burgett telephoned the Plaintiff about COVID-19 relief escorts for medical supplies that were coming from a military base and going to hospitals throughout Indiana. Ex. A, 35:15–18, 76:10–12; Ex. M at 2–3. The Plaintiff testified:

> Okay. I mean, to my recollection, at this time essentially Mr. Burgett called me about doing some COVID-relief escorts for medical supplies, and he asked, you know, what my name was, and I told him my name. He's like, "No. What's your full name?"
> And I told him, "Nedal Samir Nabhan."
> He said, "Nah. What's your full full name?"

> I'm like, "That is my full name."
> He's like, "No, no. What's your actual full name?
> So I told him, "My actual full name is Nedal Samir Mohamid Nabhan Darabbid."

Ex. A, 35:15–36:3; Ex. M at 2–3. Sgt. Burgett told the Plaintiff he needed the full name because the military was compiling a list. Ex. A, 76:13–16. The Plaintiff testified that Sgt. Burgett then said, "'I'm going to give this name to the guards at the military installation that we're going to,' and that they would check me for he either said bombs or terrorist activity or something to that effect." *Id.* 36:5–10. The Plaintiff could not believe they were having that conversation and that his national origin was being brought up in a negative light. *Id.* 36:10–19.

6.      *"Turka Turka Durka Durka" Comment*

In July 2020, while working from home, the Plaintiff was on the phone with Sgt. Burgett "going over a case that [he] was working . . . and after a period of time . . . Sgt. Burgett said, 'I didn't really hear anything you said. All I heard was "turka turka durka durka"' or something to that effect." Ex. A, 36:24–37:1, 37:7–20; Ex. M at 7. This was a derogatory comment towards his national origin, and he was in disbelief that the comment was made. Ex. A, 38:8–17; Ex. M at 7; *see also* Ex. 21. Sgt. Burgett was disciplined for making this comment. *See infra* Part E.

7.      *"It's the Taliban" Comments*

The Plaintiff testified that, if something was wrong and he did not have an explanation, Sgt. Burgett would say, "Hey, maybe it's the Taliban." Ex. A, 29:9–15. The Plaintiff understood Sgt. Burgett to be suggesting that a terrorist organization did something to his work. *Id.* 29:16–24. The Taliban references were one of the things Sgt. Burgett would often refer to, along with things like the reference to Gary and comments about him not knowing what he's doing. *Id.* 28:20–29:8. The Plaintiff stated that these references irritated him, made him feel "like he is being lumped in," and made him feel bad. Ex. M at 9–10. Sgt. Burgett made references to the

Taliban to other troopers if someone was not paying attention or if something was not working properly. Ex. B, 40:16–41:3.

**D.     The Plaintiff's October 2020 Request to Transfer to Road Duty**

Sometime before October 21, 2020, the Plaintiff told Sgt. Burgett that he wanted to return to road work within the CVED, explaining that he did not want to submit his request to command because he thought Major Smithers would not approve the request. Ex. D, ¶¶ 23, 24. Sgt. Burgett had no authority as squad leader to grant or approve transfer requests and told the Plaintiff to submit his request through the proper channels. *Id.* ¶¶ 25, 26. Major Smithers had the approval authority on the request for transfer. Ex. C, 52:13–16.

The Plaintiff drafted a letter to Major Smithers dated October 21, 2020, with the subject "Compliance Review," requesting reassignment back to his prior road job with Sgt. Dale Turner's squad in CVED where he "excelled at the work," "will have less stress," and "will be able to be better for my family." He explained that the compliance investigator job was not what he thought it would be, the job was very stressful, he was on several medications, and his home and family life was affected. He stated he has a great deal of respect for the people who do the job. The letter did not reference any issues with Sgt. Burgett. Ex. Q at 3.

On October 21, 2020, the Plaintiff emailed the letter to Sgt. Burgett, and on October 27, 2020, Sgt. Burgett forwarded the letter to F/Sgt. Schmidt along with his own comments. He wrote that the Plaintiff was not achieving the basic progression points expected after seventeen months, the continued lack of performance was not resolved after five counseling sessions, and it appeared the situation would need to be resolved through the disciplinary process. Thus, Sgt. Burgett supported the Plaintiff's request to return to his road position. Ex. Q. At some point, Sgt.

Burgett told F/Sgt. Schmidt about certain performance concerns he had with the Plaintiff, which F/Sgt. Schmidt relayed to Lt. Utterback. Ex. B, 60:4–11.

On October 29, 2020, at 6:02 a.m., Sgt. Burgett sent an email invitation to Lt. Utterback, F/Sgt. Schmidt, and the Plaintiff for a meeting on November 10, 2020, requested by Lt. Utterback. Ex. 9 at 2; Ex. B, 59:16–25. Lt. Utterback had concerns about the Plaintiff's productivity and whether his non-department employment was affecting his job duties. Ex. W at 2; Ex. C, 44:4–11, 45:14–19. Several minutes later, Sgt. Burgett called the Plaintiff to tell him that the meeting was to discuss the Plaintiff's transfer request and whether the Plaintiff's non-department business was getting in the way of his duties. Ex. 10. From December 2019 through November 2020, the Plaintiff did non-department work in insurance, real estate, and construction remediation, which had been approved consistent with ISP policy. Ex. A, 62:20–25; Ex. C, 44:19–45:4, 46:4–9; Ex. 33.[4] On October 30, 2020, Sgt. Burgett sent a new meeting invite to the same recipients, changing the meeting from November 10 to November 6. Ex. 9, at 1.

On October 30, 2020, the Plaintiff met with Major Williams, from the Logistics Division, to discuss issues he was having with Sgt. Burgett, recounting the conversation about being asked his full name for the COVID-19 transport and being told either that he would be checked for bombs or for terrorist activity. Ex. A, 34:9–15; Ex. I-1, at 2.[5] The Plaintiff also recounted the comments about the Gary area and that he had witnessed Sgt. Burgett make inappropriate comments to personnel at two different trucking companies during investigations. Ex. I-1, at 2.

---

[4] Facts regarding Sgt. Burgett's non-department employment are not relevant because the Plaintiff has not brought a disparate treatment claim against ISP.

[5] In December 2019, the Plaintiff had talked to Sergeant Dan Avitia about Sgt. Burgett's conduct because Sgt. Avitia is a minority sergeant from the same area. Ex. A, 30:5–31:5. At Sgt. Avitia's suggestion, the Plaintiff began documenting his concerns about Sgt. Burgett on March 19, 2020. *Id.* 86:1–5; Ex. 8. Sgt. Avitia advised him to document the conduct and "get out as soon as I could because it wasn't going to get any better"; Sgt. Avitia did not advise him to file a formal EEO complaint. Ex. A, 75:11–14, 23–25.

Major Williams documented the conversation on an ISP Allegation of Employee Misconduct form and emailed it the same day to Major Nila Miller-Cronk in ISP's Internal Investigations Section. Ex. R at 2; Ex. I-1. As discussed more below, Major Miller-Cronk initiated an investigation on November 10, 2020, and Sgt. Burgett learned of the complaint and investigation on November 13, 2020.

On November 5, 2020, Sgt. Burgett sent an email with documents to Lt. Utterback and F/ Sgt. Schmidt in advance of the November 6, 2020 meeting. He stated he would be transiting the Plaintiff to an earlier shift with his duty station at the post in Lowell "to remove distractions he may be experiencing at home and put him in more of a position to allow" supervision. Ex. X.

During the November 6, 2020 meeting, the effect of the Plaintiff's non-department employment on his job performance was discussed, and Sgt. Burgett suggested the Plaintiff's work was affecting his performance. Ex. L at 3; Ex. A, 78:14–25; Ex. 1, ¶ 88. At the end of the meeting, Lt. Utterback did not find that the non-department employment was affecting the Plaintiff's job performance, allowed him to continue to work from home, and told him to "give a good effort and try to be better." Ex. C, 50:13–22, 53:2–12. The Plaintiff was told at the meeting his transfer request was denied—a decision made by Major Smithers. *Id.* 53:2–12; Ex. L at 3.

**E.    Internal and EEO Investigations of Sgt. Burgett**

*1.    ISP's Internal Process for Complaints and Investigation Procedures*

The Indiana State Police Standard Operating Procedure on Equal Employment Opportunity (EEO SOP) establishes "guidelines for reporting, investigating, and resolving employee . . . discrimination complaints." Ex. Y at 1. The Policy is to "provide equal employment opportunities to employees . . . and [to] investigate complaints or allegations concerning employment discrimination based on race, sex, religion, national origin, color, age, or

15

disability; in accordance" with federal law. *Id.* Pursuant to the EEO SOP, "[d]epartment personnel who believe they have been the subject of discriminatory employment practices and wish[] to file a formal complaint shall contact the Department's EEO Officer directly . . . without having to follow the normal chain of command." *Id.* 2. The EEO Officer determines whether the complaint has legal standing and, if so, advises the Superintendent of the general nature of the complaint and who filed it. *Id.* 3. The SOP sets out the procedures for an investigation. *Id.* 3–4. The Internal Investigations SOP establishes "guidelines for receiving and investigating allegations of employee misconduct received from the public or Department personnel." Ex. Z. An employee can report alleged misconduct directly to the Superintendent, and an employee receiving an allegation of employee misconduct completes a confidential Allegation of Employee Misconduct form and then forwards it to the receiver's commander. *Id.* 1–4. The SOP sets out the procedures for an investigation. *Id.* 5–12.

The Plaintiff represents in his affidavit that F/Sgt. Mike Meinczinger was the CVED EEO officer. Ex. 1, ¶ 96. The Plaintiff states that he did not complain to F/Sgt. Meinczinger because he allegedly had a reputation of being racist and because F/Sgt. Meinczinger and Sgt. Burgett were friends. Ex. 1, ¶¶ 103–05. However, Major Smithers avers that, in 2020, F/Sgt. Meinczinger was the CVED Federal Motor Carrier Safety Administration Title VI Coordinator and that Major Miller-Cronk was, and remains, the EEO Officer for ISP, including for CVED. Ex. AB, ¶¶ 3, 4.

*2.    Investigation of Sgt. Burgett*

As noted above, on October 30, 2020, Major Williams relayed the Plaintiff's complaint to Major Miller-Cronk. On November 10, 2020, both an internal investigation and an EEO investigation were approved at Major Miller-Cronk's request, and on November 12, 2020, Major

Miller-Cronk directed F/Sgt. Sherri Heichelbech and Sgt. William Jones III to conduct the combined investigation. Exs. R, S. On November 13, 2020, during a meeting with Major Smithers and Captain Christopher Barr, Sgt. Burgett was notified of the Plaintiff's complaint, that the investigation had been initiated, and that the Plaintiff would be reassigned to F/Sgt. Schmidt. Ex. B, 43:7–44:6; Ex. T. Sgt. Burgett testified that he was "shocked" at the time of the complaint "[b]ecause other than some work performance issues, [the Plaintiff] and I spoke regularly . . . . Never once had a feeling that he wasn't content with, you know, our interaction, as far as that goes." Ex. B, 46:18–47:4. Sgt. Burgett's one-year probationary period was extended through the resolution of the investigation. Ex. G, H. During the investigation, the Plaintiff retained his position as a compliance review investigator. Ex. M at 1.

During December 2020, F/Sgt. Heichelbech and Sgt. Jones interviewed staff, including the Plaintiff, F/Sgt. Schmidt, Sgt. Avitia, and Sgt. Burgett. Exs. L–O. During his interview on December 29, 2020, Sgt. Burgett became upset and said that "f***ing pisses me off" because he has dedicated himself to the department and works hard every day. Ex. B, 56:3–12; Ex. N at 11. He testified that the phrase was not appropriate. Ex. B, 56:13–16. He was disciplined for having said it. *See infra*.

On February 8, 2021, F/Sgt. Heichelbech issued a 21-page Summary of the investigation. Ex. L. On March 3, 2021, Superintendent Douglas Carter wrote a letter to Major Smithers directing that charges be brought against Sgt. Burgett. Ex. 29. The Statement of Written Charges brought by Major Smithers, dated March 3, 2021, provides:

1. On or about March thru October 2020, Sergeant Burgett was discourteous when, while conducting an onsite review with a transportation company, he commented to the effect that It's the Russians when the company representative had computer issues, such conduct that is unbecoming an Indiana State Police employee, in violation of Regulation 7, Section 7-3(11).

2.  On or about March thru October 2020, Sergeant Burgett did commit unwelcome conduct of a verbal nature when, while on a telephone conversation with Senior Trooper Nabhan regarding one of his cases, he made a comment to the effect of all I heard was durka, durka, creating an intimidating, hostile or offensive work environment, contrary to Superintendent Carter's Guidelines on Harassment in the Workplace memorandum dated January 14, 2013, in violation of Regulation 7, Section 7-3(16).

3.  On or about December 29, 2020, Sergeant Burgett was discourteous when, while in an internal investigation interview as an accused employee, he made a comment to the interviewers to the effect that Senior Troop Nabhan feels the need to run his name in the ground which fucking pisses him off, such conduct is unbecoming of an Indiana State Police employee, in violation of Regulation 7, Section 7-3(11).

Ex. U.[6]

Sgt. Burgett received the charges on March 3, 2021. *Id.* at 2. On March 17, 2021, Major Smithers held a hearing, Ex. 34, and on March 29, 2021, he found that the evidence supported the charges, imposing a four-day suspension on Sgt. Burgett from April 6–9, 2021, Ex. U at 3. Sgt. Burgett's probationary period as sergeant ended following the suspension, and he was placed in the rank of sergeant permanently on April 23, 2021. Ex. E.

On March 30, 2021, Major Miller-Cronk sent the Plaintiff an email providing an information packet containing the charges and discipline of Sgt. Burgett. Ex. 15. She informed him that the investigation was adjudicated and that "Sgt. Burgett will maintain his rank and remain in charge of the audit program." *Id.* She then wrote:

If you chose to remain in your current position he will be your supervisor and you will work from a scale house or state facility during duty hours and not your home. The other option is to return as a CVE Officer on the road under Sgt. Dale Turner. I am being told you will let Major Smithers know your decision on Monday.

---

[6] Regulation 7 governs "Discipline," and Section 7-3 governs "offense by Employees." Ex. V. A Section 7-3(11) violation is for "conduct that reflects unfavorably on the Department." *Id.* A section 7-3(16) violation is for "[v]iolating a Department regulation, rule, standard operating procedure, or a written or verbal order of any supervisor when such order is within the scope of the authority of said supervisor." *Id.*

*Id.* The Plaintiff chose to transfer out of the investigation department to road duty effective April 4, 2021. Ex. A, 80:16–18; Ex. 16. In 2021, he was promoted to detective with ISP and works in the laboratory division and the digital forensic unit. Ex. A, 10:10–18.

## F.    The Plaintiff's Mental Health

Beginning May 4, 2021, the Plaintiff began psychotherapy because of the after-effects of Sgt. Burgett's harassment and bullying. Ex. 1, ¶ 106. Mrs. Nabhan stated that Sgt. Burgett's harassment of the Plaintiff has affected his relationship with his children, depleted his patience, and caused a strain on their marriage. Ex. 2, ¶¶ 46, 48. On June 23, 2022, the Plaintiff was examined by psychiatrist Dr. Gerald A. Shiener, who diagnosed him with major depression with features of posttraumatic stress disorder, chronic, resulting from Sgt. Burgett's harassment and who opined that the Plaintiff suffered from posttraumatic stress disorder that arose out of his experience working for Sgt. Burgett. Ex. 27 at 5. Dr. Shiener opined that the Plaintiff's illness is chronic and the effects have become permanent. *Id.* at 7.

## ANALYSIS

The Defendants move for summary judgment on all counts of the Amended Complaint.

## A.    Title VII—Hostile Work Environment Claim Against ISP

In Count I, the Plaintiff brings a Title VII claim of hostile work environment based on his race and national origin. Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of [his] race . . . or national origin." 42 U.S.C. § 2000e-2(a)(1). "A work environment is hostile under Title VII when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Scaife*

*v. U.S. Dep't of Veterans Affs.*, 49 F.4th 1109, 1115 (7th Cir. 2022) (cleaned up) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). A plaintiff must show (1) he was subject to unwelcome harassment; (2) the harassment was based on a reason forbidden by Title VII—here, race or national origin; (3) the harassment was so severe or pervasive that it altered the conditions of employment and created a hostile or abusive working environment; and (4) there is a basis for employer liability. *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018) (citing *Alamo v. Bliss*, 864 F.3d 541, 549 (7th Cir. 2017)).[7]

The third element contains both a subjective and an objective component. *EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 625 (7th Cir. 2018) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)). In determining whether conduct was objectively hostile, the court considers all the circumstances, including "the severity of the allegedly conduct, its frequency, whether it [wa]s physically threatening or humiliating (or merely offensive), and whether it unreasonably interfere[d] with an employee's work performance." *Gates v. Bd. of Educ. of the City of Chi.*, 916 F.3d 631, 636 (7th Cir. 2019) (citing *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018)); *Alamo*, 864 F.3d at 549–50 (quoting *Harris*, 510 U.S. at 23). That said, "employers generally do not face liability for off-color comments, isolated incidents, teasing, and other unpleasantries that are, unfortunately, not uncommon in the workplace." *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 881 (7th Cir. 2018).

It is undisputed that the Plaintiff is a member of a protected class as a Palestinian Arab American and that he subjectively perceived his work environment to be hostile based on Sgt.

---

[7] Some courts in the Seventh Circuit phrase the test differently, but the inquiry is the same: (1) his work environment was both subjectively and objectively offensive; (2) the harassment was based on his membership in a protected class; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability. *See Scaife*, 49 F.4th at 1115–16; *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 896 n.6 (7th Cir. 2016).

Burgett's conduct. However, he has failed to create a genuine dispute of fact that Sgt. Burgett's conduct was objectively hostile based on his race or national origin or that the conduct based on his race or national origin was sufficiently severe or pervasive to alter the conditions of his employment. "Whether harassment was so severe or pervasive as to constitute a hostile work environment is generally a question of fact for the jury." *Johnson*, 892 F.3d at 901 (citing *Passananti v. Cook County*, 689 F.3d 655, 669 (7th Cir. 2012)). "In order to remove such a question of fact from the jury on summary judgment, the court would have to determine that no reasonable jury could find the conduct at issue severe or pervasive." *Id.* Such is the case here.

As an initial matter, the Plaintiff has failed to show that several bases of his hostile work environment claim were related to his race or national origin, removing them from consideration. *See Cole*, 838 F.3d at 896 ("Although a connection between the harassment and the plaintiff's protected class need not be explicit, there must be some connection, for not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority." (cleaned up)).

First, there is no evidence that the Plaintiff's extensive complaints about Sgt. Burgett's communication and management styles were based on or because of his race or national origin. These complaints include Sgt. Burgett micromanaging; calling several times a day and after hours; making belittling and mocking comments; using a tone that was berating, scolding, demeaning, and unprofessional; talking to him like a child who did not know what he was doing; nitpicking, being overly critical, and requiring error-free work; and being a terrible supervisor with no leadership skills. *See, e.g.*, *Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018) (finding that supervisors who "were short tempered, hostile, unfairly critical, and disrespectful" and being subject to "excessive monitoring" did not constitute conditions that were objectively

offensive, severe, or pervasive) (cleaned up)); *Hambrick v. Kijakazi*, 79 F.4th 835, 843 (7th Cir.

2023) ("No reasonable jury could conclude that being assigned duties that were part of one's job

description . . . amount[s] to a hostile work environment." (cleaned up) (quoting *Hobbs v. City of*

*Chicago*, 573 F.3d 454, 464 (7th Cir. 2009))).

　　In fact, Master Troopers Rimel and DeVries, two white troopers who left the compliance

review investigation squad when Sgt. Burgett was their supervisor and before the Plaintiff

brought his complaint to Major Williams, similarly described Sgt. Burgett's communication and

supervisory styles as demeaning, humiliating, and demoralizing in his speech, almost tyrannical,

and "his way or the highway." They also stated that Sgt. Burgett did not want to hear complaints,

was a micromanager, had high expectations, and was set in his ways. Sgt. Burgett's own

supervisor, who is white, described him as a micromanager and not polished in dealing with

people when there is work to accomplish. *See Scaife*, 49 F.4th at 1117 (finding that, although the

supervisor's conduct of threatening the plaintiff, requesting that the plaintiff break the law, and

consistently yelling at her created a hostile work environment, the plaintiff failed to show that the

conduct was based on gender); *Hambrick*, 79 F.4th at 843 (finding that the plaintiff had "fail[ed]

to show that any of the alleged harassing incidents were 'based on membership in a protected

class'" (quoting *Trahanas v. Nw. Univ.*, 64 F.4th 842, 853 (7th Cir. 2023))); *Cole*, 838 F.3d at

896 ("[F]orms of harassment that might seem neutral in terms of race . . . can contribute to a

hostile work environment claim if evidence supports a reasonable inference tying the harassment

to the plaintiff's protected status." (citations omitted)).

　　Also unrelated to the Plaintiff's race and national origin as a Palestinian Arab American

are the comments belittling people from the Gary, Indiana area and the time Sgt. Burgett played

a rap song from a Chicagoland area rapper for the Plaintiff to ask if he knew the artist. These

comments are only related to where the Plaintiff lives and works and the Plaintiff's interest in rap music. Although the Plaintiff was offended by the comments about Gary, Indiana, because he felt it belittled the area where he is from, the comment is unrelated to his race or national origin. And there is no indication that the Plaintiff, who admittedly listens to rap music, was offended by the rap song conversation other than feeling it was not relevant to his work.

Finally, during two inspections in the Plaintiff's presence, Sgt. Burgett said "it's the Russians" to one company representative, who had a heavy Lithuanian accent and who was having trouble with her computer, and "Is that a Russian Submarine" when a ping sound was heard to the other company's owner, who had a heavy Eastern European accent. The comments were not directed at the Plaintiff nor were they about the Plaintiff's Arab race or Palestinian national origin. *See Swyear*, 911 F.3d at 882 ("The American workplace would be a seething cauldron if workers could with impunity pepper their employer and eventually the EEOC and the courts with complaints of being offended by remarks and behaviors unrelated to the complainant except for his having overheard, or heard of, them." (quoting *Yuknis v. First Student, Inc.*, 481 F.3d 552, 556 (7th Cir. 2007))). At most, this was unprofessional conduct while on official duty for which Sgt. Burgett was ultimately disciplined. *See Brooks v. Avancez*, 39 F.4th 424, 441 (7th Cir. 2022) ("Although . . . a series of separate, isolated acts can collectively add up to a hostile work environment, occasional vulgar language, and coarse, rude, or boorish behavior will not amount to a hostile work environment." (citing *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 678 (7th Cir. 2005))).

This leaves three alleged instances of harassment: Sgt. Burgett's comments that "it must be the Taliban" when things were not going well; Sgt. Burgett's request for the Plaintiff's name for the inspection at the military base and the comment that he would be inspected either for

bombs or for terrorist activity; and Sgt. Burgett's "all I heard was 'turka turka durka durka'" comment. As for the first, Sgt. Burgett would reference the Taliban as being responsible when something would inexplicably go wrong at work. Although Sgt. Burgett made that comment to the Plaintiff, he made similar comments to other troopers. And there is no evidence that Sgt. Burgett stated, much less implied, that the Plaintiff himself was a member of the Taliban.

The remaining two comments could be viewed as related to the Plaintiff's race but are not severe or pervasive, even when considered together. First, in March 2020, at the outset of the COVID-19 pandemic, Sgt. Burgett and the Plaintiff were assigned to drive relief escorts for medical supplies coming from a military base and going to hospitals throughout Indiana. Sgt. Burgett asked the Plaintiff for his full name because the military was compiling a list. Sgt. Burgett asked for his "actual full name" even after the Plaintiff gave "Nedal Nabhan" and "Nedal Samir Nabhan," to which the Plaintiff gave "Nedal Samir Mohamid Nabhan Darabbid." Then Sgt. Burgett commented that the Plaintiff would be checked for bombs or for terrorist activity at the military base. The Plaintiff felt Sgt. Burgett made the comment because of his national origin. The Defendants argue that the comment did not reference the Plaintiff's national origin and was, at most, insensitive. While a reasonable inference could be drawn that Sgt. Burgett was implying the Plaintiff would be inspected for bombs or terrorist activity because of his Arabic name, the Plaintiff has not identified evidence that the comment was made to intimidate, ridicule, or insult him. It was also an isolated comment. *See Johnson*, 892 F.3d at 900 ("Offhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment." (quoting *Passananti*, 689 F.3d at 667)).

Second, in July 2020, while talking on the phone, Sgt. Burgett said to the Plaintiff, "I didn't really hear anything you said. All I heard was 'turka turka durka durka.'" The Plaintiff

testified that this is a derogatory phrase to Middle Easterners. *See* https://en.wiktionary.org/
wiki/durka_durka (last visited Dec. 9, 2024) (defining "durka durka" as an offensive ethnic slur
mimicking Middle Eastern speech). A reasonable jury could find this comment objectively
offensive. Indeed, ISP found that this comment "create[ed] an intimidating, hostile or offensive
work environment," in violation of the Guidelines on Harassment in the Workplace
memorandum, and Sgt. Burgett was disciplined as a result. However, this isolated comment,
while offensive and inappropriate, does not rise to the level of severe or pervasive harassment
based on the Plaintiff's race or national origin for Title VII liability, even when combined with
the March 2020 comment about being checked for bombs or terrorist activity. *See Nichols v.
Mich. City Plant Plan. Dep't*, 755 F.3d 594, 601–02 (7th Cir. 2014) (finding that one instance of
being called a "black n—r" was "not severe enough to trigger liability" and that, even when that
instance was considered with six other incidents of allegedly harassing conduct in a two-and-a-
half-week period, the claim still failed). While one instance of conduct that is sufficiently severe
may be enough, this is not such a case. *See id.* at 601 (citing *Haugerud v. Amery Sch. Dist.*, 259
F.3d 678 (7th Cir. 2001)). Nor is this an instance in which separate incidents that are not
individually severe trigger liability because they frequently occur. *Id.* (citing *Jackson v. County
of Racine*, 474 F.3d 493, 499 (7th Cir. 2007)). The comments in March and July were two
isolated incidents that objectively do not rise to the level of conduct that alters the terms and
conditions of employment.

      The Plaintiff cites three cases in which the court held that a reasonable jury could find the
harassment severe or pervasive; however, the facts of the instant case do not approach the level
of direct, race and national origin-based harassment in those cases. First, in *Sabet v. City of North
Chicago*, the plaintiff police officer, an Iranian immigrant and practicing Muslim, alleged

harassment from 2013 to 2016, including, but not limited to, officers calling him "falafel-head," telling him to "[g]o eat your falafel and hummus," and asking if he was eating "camel balls" or "goat balls"; a group of officers, including two sergeants and a detective, calling him a "fucking terrorist" and repeatedly accused him of being a member of Al-Qaeda; officers calling him a "goat-fucker" in front of their superior officers; officers accusing him of working for ISIS; an officer commenting that all Muslims kill Christians and provoke violence; an officer telling him that Iran should be nuked; an officer yelling "underjayee" at him during the entire shift; a sergeant and a detective announcing that he "drinks goat milk and fucks his goats before coming to work"; and officers, in front of their superior officer, accusing him of eating goat balls, complaining of the smell of his food, and yelling "durka durka durka" at him. No. 16-CV-10783, 2020 WL 832360, at *2–4, 13 (N.D. Ill. Feb. 20, 2020).

In *Yasin v. Cook County Sheriff's Department*, the plaintiff consistently reported more than a hundred incidents of co-worker harassment over the course of a year, which included receiving calls on the phone and over the radio at work calling him a "terrorist," "camel jockey," "shoe bomber," "Arab," "Hussein, "and "bin Laden"; a newspaper article regarding terrorism being posted on his locker; a coworker stating "he's making a bomb" when he did not answer a radio call; coworkers yelling out "camel jockey" or "camel" when he was around; someone yelling "sand nigga" in the locker room; a conversation in the locker room about the shoe bomber and someone said "Yasin's got bombs in his shoes"; the words "sand nigga" being written on his locker; correctional officers talking about hog-tying Muslims in Iraq in front of Yasin; and "Yasin bin Laden" being written on a bathroom stall in the men's locker room. No. 07 C 1266, 2009 WL 1210620, *2–3, 4 (N.D. Ill. May 4, 2009).

In *Khan v. County of Cook*, the plaintiff, who is of Indian descent, asked for an explanation for the change in his lunch hour, and his supervisor responded, "Bin Laden, I don't have to give you no reason." No. 13 C 8947, 2016 WL 3520148, at *1 (N.D. Ill. June 28, 2016). The supervisor had called the plaintiff "Bin Laden" more than three times, and other employees followed the supervisor's lead and called the plaintiff "Bin Laden" in front of the supervisor, who did nothing. *Id.* at *2. The court found that the conduct could be considered objectively hostile and racially motivated. *Id.* *5–6. Although a close call, the court also found the plaintiff had offered enough evidence that the harassment was pervasive because it was directed at him and only him, it was more than a one-time occurrence, and other employees followed the supervisor's lead in using the slur. *Id.* at *6.

To align his claim with these cases, the Plaintiff argues in his brief that Sgt. Burgett "indirectly referred to [him] as a terrorist," citing two pieces of evidence. ECF No. 74 at 9. This is a serious contention that cannot be reasonably inferred from the evidence. First, the Plaintiff cites Sgt. Burgett's frequent comments about the Taliban. But the Plaintiff himself understood Sgt. Burgett to be insinuating that the Taliban had done something to the Plaintiff's work product. There is no evidence that Sgt. Burgett was insinuating that the Plaintiff himself was a member of the Taliban, and the Plaintiff did not testify that was Sgt. Burgett's intent. Nor was the Plaintiff the target of these comments when made to other troopers. The Plaintiff also cites the March 2020 comment that the Plaintiff may be searched for bombs or terrorist activity at the military installation for the COVID-19 relief effort. The comment was made in the context of asking the Plaintiff for his full name for the required paperwork. At the worst, an inference can be drawn that Sgt. Burgett was suggesting that the Plaintiff's vehicle would be searched because

27

of his Arabic name. The evidence does not support an inference that Sgt. Burgett was calling the Plaintiff a terrorist.

Thus, the hostile work environment claim fails because most of the negative or hostile aspects of the workplace were not specific to the Plaintiff or were insensitive or boorish comments that were not directed to the Plaintiff or only to the Plaintiff or were unrelated to his race or national origin. *See Smith*, 936 F.3d at 560 (finding that "the majority of the harassment he identifies was unconnected to his race"). And the remaining two incidents in March and July 2020 together were not sufficiently severe or pervasive to alter the conditions of the Plaintiff's employment. For these reasons, the Court grants summary judgment for Defendant ISP on the Title VII claim for hostile work environment in Count I.

Even if the Plaintiff could show that Sgt. Burgett's conduct was severe or pervasive, the claim would still fail because there is no basis for employer liability. "An employer's liability for a hostile work environment claim depends on whether the harasser was the victim's supervisor or . . . merely a co-employee." *Clacks v. Kwik Trip, Inc.*, 108 F.4th 950, 957 (7th Cir. 2024) (citing *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 813 (7th Cir. 2022)). The parties agree that Sgt. Burgett was a supervisor for purposes of determining employer liability. "If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable." *Vance*, 570 U.S. at 424. However, if there is no tangible employment action, then "the employer may escape liability" with the *Faragher-Ellerth* affirmative defense by establishing "that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) . . . the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Id.* (citing *Faragher*, 524 U.S. at 807; *Burlington Indus. v. Ellerth*, 524 U.S. 742, 765 (1998)); *see Paschall*, 28 F.4th at 813 ("When a supervisor is the harasser, the

employer is strictly liable for his or her conduct, subject to any affirmative defenses that may preclude its liability."); *Hunt v. Wal-Mart Stores, Inc.*, 931 F.3d 624, 627–28 (7th Cir. 2019).

Thus, if the Plaintiff can establish that a tangible employment action was taken against him, he can prevent ISP from claiming the *Faragher-Ellerth* defense. For purposes of liability for supervisor harassment, "[a] tangible employment action is a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Trahanas*, 64 F.4th at 853 (quoting *Vance*, 570 U.S. at 431).[8] The Plaintiff identifies two employment actions, but as argued by the Defendants, neither meets the definition of a tangible employment action.

First, the Plaintiff contends that the hostile work environment itself was an adverse employment action. However, for vicarious liability to attach, the "hostile work environment created by a supervisor" must be "*accompanied by* an adverse employment action." *Id.* at 854 n.3 (emphasis added) (quoting *Faragher*, 524 U.S. at 805–06; *Ellerth*, 524 U.S. at 765).

Second, the Plaintiff contends that he suffered an adverse employment action when his October 21, 2020 request to be transferred from the compliance review investigator position to

---

[8] While this motion was being briefed, the Supreme Court decided *Muldrow v. City of St. Louis*, which resolved "a Circuit split over whether an employee challenging a transfer under Title VII must meet a heightened threshold of harm—be it dubbed significant, serious, or something similar." 601 U.S. 346, 353 (2024). Analyzing the statutory text, the Supreme Court held: "To make out a Title VII discrimination claim, a transferee must show some harm respecting an identifiable term or condition of employment" but not "significant" harm. *Id.* at 354–55. The Plaintiff appears to suggest, without legal analysis, that the *Muldrow* holding rejecting a "significance test" for discrimination claims should be extended to the "tangible employment action" requirement for vicarious liability for hostile work environment claims. As other courts have noted, there is no indication in *Muldrow* that the Supreme Court intended to change the requirements for vicarious liability on a Title VII hostile work environment claim established in *Faragher* and *Ellerth*. *See Russell v. Wormuth*, No. 22-4035, 2024 WL 4707958, at *8 n.6 (D. Kan. Nov. 7, 2024) (citing *Zuniga v. City of Dallas*, No. 23-CV-2308-D, 2024 WL 2734956, at *3 n.3 (N.D. Tex. May 28, 2024)); *see also Williams v. Memphis Light, Gas & Water*, No. 23-5616, 2024 WL 3427171, at *5, 7–8 (6th Cir. July 16, 2024) (applying *Muldrow* to a discrimination claim but not to a hostile work environment claim). Notably, the Supreme Court in *Muldrow* explicitly rejected the invitation to apply the "materially adverse" test for Title VII retaliation claims to Title VII discrimination claims because the "materially adverse" test was adopted for "reasons peculiar" to that context. 601 U.S. at 357.

road duty trooper position was denied. However, his rank and pay were the same in the CVED whether he was an investigator or on road duty, and the Plaintiff has not identified any significant change in duties or benefits that he was denied. Rather, he reasons that the denial of the transfer request was really a denial of his desire to avoid Sgt. Burgett's harassment by changing jobs and thus the denial was a tangible employment action. But there is no evidence that any decisionmaker knew at the time the request was denied at the November 6, 2020 meeting that the real reason for the request was to escape Sgt. Burgett's harassment rather than the stated reasons in his letter to Major Smithers that the investigator position was stressful, was not what he expected, and was affecting his personal life. While the Plaintiff met with Major Williams on October 30, 2020, to discuss his concerns about Sgt. Burgett and the same day Major Williams communicated the report to Major Miller-Cronk, there is no evidence that Major Smithers, Lt. Utterback, or Sgt. Burgett knew about his complaint. With no knowledge by Major Smithers of the Plaintiff's intent, no reasonable inference can be drawn that the denial of the Plaintiff's transfer request was to purposefully thwart his attempt to escape Sgt. Burgett.

Because the Plaintiff has not offered evidence of a tangible employment action, the Court moves on to consider ISP's *Faragher-Ellerth* defense. *See Trahanas*, 64 F.4th at 853–54 (quoting *Hunt*, 931 F.3d at 628). First, ISP has shown that "it exercised reasonable care to prevent and correct promptly any . . . harassing behavior." *Id.* at 854 (quoting *Hunt*, 931 F.3d at 628). It is undisputed that ISP had a written anti-harassment policy providing instructions for an employee to file a complaint, which is sufficient to satisfy the requirement to take "reasonable care to prevent" harassment. *See id.* In addition, ISP "exercised reasonable care to . . . correct promptly" the harassment once the Plaintiff informed Major Williams of his concerns about Sgt. Burgett on October 30, 2020. That same day, Major Williams transmitted them to Major Miller-

Cronk. On November 10, 2020, Major Miller-Cronk requested a dual EEO and internal investigation, which began on November 12, 2020. On November 13, 2020, Sgt. Burgett was informed of the investigation and that the Plaintiff was being reassigned to F/Sgt. Schmidt. The investigation report was issued on February 8, 2021, charges were issued on March 3, 2021, and a hearing was held on March 17, 2020. On March 29, 2021, Major Smithers found the evidence supported the charges against Sgt. Burgett, and Sgt. Burgett served his suspension from April 6–9, 2021. "[A] prompt investigation is the 'hallmark of a reasonable corrective action." *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 636 (7th Cir. 2009) (quotation omitted).[9]

Second, ISP has shown that, prior to his October 30, 2020 complaint to Major Williams, the Plaintiff "unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to otherwise avoid harm." *Trahanas*, 64 F.4th at 854 (quoting *Hunt*, 931 F.3d at 628). ISP's EEO SOP provided that "department personnel who believes they have been the subject of discriminatory employment practices and wish[] to file a formal complaint shall contact the Department's EEO Officer" without having to follow the normal chain of command. And the ISP internal investigations SOP provided that the Plaintiff could have submitted a complaint himself. The EEO officer was Major Miller-Cronk. The Plaintiff incorrectly believed F/Sgt. Meinczinger was the EEO officer and states that he did not report his concerns to F/Sgt. Meinczinger because he allegedly had a reputation of being racist and was friends with Sgt. Burgett. Even if F/Sgt. Meinczinger had been the EEO officer, "an employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the

---

[9] For the first time in his sur-reply, the Plaintiff contends, without documentary support other than his own affidavit, that Sgt. Avitia had a duty to report the alleged harassment the Plaintiff had discussed with him. Because the Plaintiff did not make this argument in his opening response brief, it is waived. *See United States v. Williams*, 85 F.4th 844, 849 (7th Cir. 2023) ("Just as undeveloped arguments are waived, so are arguments raised for the first time in reply briefs." (citation omitted)).

employee's duty to alert the employer to the allegedly hostile environment." *Hunt*, 931 F.3d at 631 (quoting *Porter*, 576 F.3d at 638); *see Trahanas*, 64 F.4th at 854 ("[F]ear of unpleasantness cannot excuse [the plaintiff] from using [the employer's] complaint mechanisms." (citations omitted)). The Plaintiff did not report Sgt. Burgett's conduct to Major Williams until October 30, 2020, which was eleven months after he alleges the harassment started. The Plaintiff argues that a reasonable jury could find, based on Dr. Shiener's report, that he did not report the alleged misconduct sooner because of his posttraumatic stress disorder, citing *Doe v. Lansal, Inc*, No. 08 CV 5983, 2009 WL 5166224, at *10 (N.D. Ill. Dec. 22, 2009) (citing *Johnson v. West*, 218 F.3d 725, 732 (7th Cir. 2000)). However, both *Doe* and *Johnson* are distinguishable on the "extreme circumstances" asserted by the plaintiffs in those cases, including direct threats and intimidation from the supervisors.

For this additional reason that the Plaintiff has failed to establish a basis for employer liability, the Court grants summary judgment for ISP on the Title VII hostile work environment claim in Count I.

## B.    Title VII—Retaliation Claim Against ISP

In Count II, the Plaintiff alleges that ISP retaliated against him for complaining about Sgt. Burgett. Am. Compl. 4, ¶ 49. To succeed on a Title VII retaliation claim, a plaintiff must produce evidence of "(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Cervantes v. Ardagh Grp.*, 914 F.3d 560, 566 (7th Cir. 2019) (citation omitted). It is undisputed that the Plaintiff engaged in protected activity when he complained to Major Williams about Sgt. Burgett on October 30, 2020, which led to the investigation and discipline of Sgt. Burgett. *See Tomanovich v. City of Indianapolis*,

457 F.3d 656, 663 (7th Cir. 2006) (recognizing that an internal complaint constitutes protected activity).

However, the Plaintiff has failed to offer evidence of a materially adverse action, which "need not be one that affects the terms and conditions of employment . . . but . . . must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Lewis v. Wilkie*, 909 F.3d 858, 867 (7th Cir. 2018) (cleaned up) (quoting *Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016)); *see Muldrow*, 601 U.S. at 357 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). "Title VII's anti-retaliation provision . . . protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Lewis*, 909 F.3d at 867–68 (citing *Burlington*, 548 U.S. at 67). The Defendants argue that the Plaintiff did not suffer a materially adverse action because he was still working for ISP and was not fired, transferred out of the CVED, or demoted either during the investigation or after its conclusion. Although the Plaintiff was reassigned to F/Sgt. Schmidt as his supervisor during the investigation, he remained in the same position within the compliance review investigation squad.

The Plaintiff contends that he suffered two materially adverse actions. First, he contends that a negative performance review by F/Sgt. Schmidt in January 2021 for the year 2020 was a materially adverse action in retaliation for his October 30, 2020 complaint. But the Seventh Circuit has held that a negative performance review by itself without a tangible job consequence is not an adverse action for purposes of a Title VII retaliation claim. *See Scaife*, 49 F.4th at 1119 (citing cases).[10]

---

[10] Moreover, the Plaintiff has no evidence of causation other than timing and his own disagreement with the performance evaluation. "[T]he fact that he disagrees with [his] supervisor's assessment does not establish pretext." *Abebe v. Health & Hosp Corp. of Marion Cnty.*, 35 F.4th 601, 607 (7th Cir. 2022). The

The second materially adverse action identified by the Plaintiff is what he contends was a constructive transfer to road duty within CVED after the investigation in April 2021. On March 30, 2021, Major Miller-Cronk provided the Plaintiff with an information packet containing the charges against and discipline of Sgt. Burgett, informed the Plaintiff that the investigation was complete and adjudicated, and explained that "Sgt. Burgett will maintain his rank and remain in charge of the audit program." She then gave the Plaintiff the option of remaining in his current position as an investigative trooper under Sgt. Burgett but working from a scale house or state facility during duty hours and not his home or of returning as a CVE Officer on the road under Sgt. Dale Turner. The Plaintiff chose to transfer out of the investigation department to road duty effective April 4, 2021, which is consistent with his October 2020 transfer request. The Plaintiff was later promoted to detective and remains employed with the ISP as a detective in the laboratory division and the digital forensic unit.

The Plaintiff reasons that he was given two bad choices—either staying under Sgt. Burgett's supervision in his current job but no longer working from home or transferring to the more arduous duty assignment of road duty. The Plaintiff has not shown that being given these options was a materially adverse action. His salary remained the same, and he remained within the CVED. The first option would have allowed him to stay in the same position, albeit no longer working from home, and any allegation by the Plaintiff that Sgt. Burgett might continue to harass him or retaliate against him had he stayed in the job is purely speculative. *See McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003) ("[M]ere speculation or conjecture will not defeat a summary judgment motion." (cleaned up)). Likewise, the Plaintiff's suggestion that he could have continued to work as an investigator under F/Sgt. Schmidt, to whom he was temporarily

---

Plaintiff speculates, without evidence, that Sgt. Burgett, who learned on November 13, 2020 of the Plaintiff's complaint against him, must have assisted F/Sgt. Schmidt with the annual review.

assigned during the investigation, is pure speculation. As for the option to transfer back to the road duty position, the job was still within the CVED and was the job he had previously worked. This is also the position he requested in his October 2020 transfer request, a fact which he omits from his analysis.

Although the duties of the two jobs were different, the Plaintiff has not shown that he was injured or harmed by what was essentially a lateral transfer that he chose or that the duties would deter a reasonable person from complaining about the harassment. *See Mercer v. Cook County*, 527 F. App'x 515, 522 (7th Cir. 2013) ("[A] mere transfer—without more, such as a reduction in pay or significantly diminished responsibilities or working conditions—falls below the level of an adverse employment action necessary to support a claim of . . . retaliation); *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 744–45 (7th Cir. 2002) (finding no adverse employment action when the employee was transferred from one division back to the employee's original division). Notably, elsewhere in his brief, the Plaintiff describes the road duty position as the more favorable position. ECF No. 74 at 17.

The two out-of-circuit cases cited by the Plaintiff are distinguishable. The court in *Hampton v. Borough of Tinton Falls Police Department*, 98 F.3d 107, 116 (3rd Cir. 1996), found that the officer's claim that road patrol was a less desirable assignment than the detective bureau was sufficient to survive summary judgment, even when the transfer did not result in a cut in pay or rank. However, the transfer to road duty in *Hampton* was involuntary and permanent. *Id.* The Plaintiff also cites *Sunkins v. Hampton Roads Connector Partners*, 701 F. Supp. 3d 342, 357 (E.D. Va. 2023), to argue that forcing an employee to continue working with his harasser creates an intolerable work environment. However, unlike in the instant case in which ISP promptly

35

conducted an investigation leading to Sgt. Burgett being disciplined, the employer in *Sunkins* ignored the plaintiff's complaints of harassment. *Id.*

Because the Plaintiff has failed to demonstrate a materially adverse action, the Court grants summary judgment for ISP on the Title VII retaliation claim in Count II.

## C.    Section 1983 Equal Protection Claim Against Sgt. Burgett

In Count III, the Plaintiff's § 1983 equal protection claim alleges that Sgt. Burgett violated his constitutional rights by intentionally discriminating against him based on his race and national origin. Am. Compl. ¶ 53.[11] Section 1983 provides, in pertinent part:

> Every person who, under color of [state law], subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. "The statute thus provides a remedy for violations of federal rights committed by persons acting under color of state law." *First Midwest Bank Guardian Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021). The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Thus, the clause guarantees "the right to be free from invidious discrimination in statutory classifications." *Nabozny v. Podlesny*, 92 F.3d 446, 453 (7th Cir. 1996) (quoting *Harris v. McRae*, 448 U.S. 297, 322 (1980)).

"In a protected-class equal protection analysis, a plaintiff must show that 'defendant[] acted with a nefarious discriminatory purpose and discriminated against him based on his membership in a definable class.'" *Word v. City of Chicago*, 946 F.3d 391, 396 (7th Cir. 2020)

---

[11] To the extent the Plaintiff discusses the liability of a governmental entity, *see* ECF No. 74 at 33–34, this § 1983 claim is not brought against Defendant ISP and any such claim would be futile as ISP is an agency of the State of Indiana. *See Endres v. Ind. State Police*, 349 F.3d 922, 927 (7th Cir. 2003) ("The Indiana State Police, as a unit of state government, is not a 'person' as § 1983 uses that term and therefore is not amenable to a suit for damages under that statute." (citation omitted)).

(quoting *Nabozny*, 92 F.3d at 453). On summary judgment, the standard for analyzing discrimination claims under Title VII and § 1983 is the same: "whether the evidence would permit a reasonable factfinder to conclude that . . . discrimination [based on race or national origin] caused the adverse employment action." *Barnes v. Bd. of Trs. of Univ. of Ill.*, 946 F.3d 384, 389 (7th Cir. 2020) (citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)).[12] In support of this claim, the Plaintiff identifies two instances when he was allegedly treated less favorably than similarly situated employees outside his protected class.

First, the Plaintiff asserts, in one sentence, that Sgt. Burgett harassed him when no other employees were harassed. In support, he makes only an internal cross reference to the Title VII hostile work environment section of his response brief, which contains no evidence or analysis identifying similarly situated employees outside his protected class who were not harassed. And in direct contradiction to this argument, the Plaintiff states in his affidavit that, at the time he requested a transfer back to road duty in October 2020, two white, male compliance review troopers—Master Trooper Rimel and Master Trooper DeVries—had transferred out of Sgt. Burgett's command because of Sgt. Burgett's "belligerent leadership style." Sgt. Burgett also made the Taliban comments to troopers other than the Plaintiff.

Second, the Plaintiff argues that he was treated less favorably by being required to meet with the chain of command about his October 2020 transfer request when Master Trooper Rimel and Master Trooper DeVries previously had their transfer requests granted without first being required to meet with the chain of command. *See* Ex. 1, ¶¶ 79–80 (stating that they both said their transfers were approved quickly and that, to the best of the Plaintiff's knowledge and belief,

---

[12] Although raised by the Defendants in their opening brief, the Plaintiff does not rely on the *McDonnell Douglas* burden-shifting framework in response to summary judgment. *See Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957–58 (7th Cir. 2021).

neither had a meeting with chain of command). However, Sgt. Burgett had no authority to grant or approve transfer requests. The evidence is that Major Smithers, who had that authority, denied the Plaintiff's transfer request. The Plaintiff offers no evidence that Sgt. Burgett had any control or influence over the decisions on any of the troopers' transfer requests.

Because the Plaintiff has failed to offer evidence to create a genuine dispute of material fact that Sgt. Burgett treated the Plaintiff differently because of his race or national origin, the Court grants summary judgment for Defendant Sgt. Burgett on the Plaintiff's § 1983 equal protection claim in Count III.

## CONCLUSION

For the reasons set forth above, the Court hereby GRANTS the Defendants' Motion for Summary Judgment [ECF No. 62]. The Court DIRECTS the Clerk of Court to enter judgment for Defendants Indiana State Police and Thomas A. Burgett and against the Plaintiff Nedal Nabhan on all counts of the Amended Complaint. The Plaintiff takes nothing by his Amended Complaint.

SO ORDERED on December 17, 2024.

 s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT

38